___ Priority
___ Send
___ Clsd
___ Enter
___ JS-5/JS-6
___ JS-2/JS-3



FILED
CLERK, U.S. DISTRICT COURT
FEB 16 2000
CENTRAL DISTRICT OF CALIFORNIA
BY           DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AVID IDENTIFICATION SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> GLOBAL ID SYSTEMS; AND DOUGLAS E. HULL, <br><br> Defendants. | CASE NO. CV 98-4055 NM (CWx) <br><br> ORDER AWARDING DAMAGES AND GRANTING PLAINTIFF PERMANENT INJUNCTIVE RELIEF |

## I
## Introduction

On May 22, 1998, plaintiff Avid Identification Systems, Inc. ("Avid") filed this action against defendants Global ID Systems ("Global") and Douglas E. Hull. The complaint asserted eight causes of action: design patent infringement, inducement of patent infringement, misappropriation of trade secrets, trademark infringement and unfair competition, interference with economic relationships, interference with prospective business advantage, violation of California's Business and Professions Code, and breach of fiduciary duty.

Four days later, plaintiff applied for a temporary restraining order and preliminary injunction. Judge Ronald S. W. Lew granted the TRO on May 29, 1998. On July 22, 1998, Judge Lew granted the preliminary injunction and restrained defendants Hull and Global from selling products allegedly infringing

FEB 17 2000
CV

104

plaintiff's patent and trademark pending trial of the action. See Thompson Dec. (10/15/99) Exh. 1.

On December 14, 1998, plaintiff filed a motion to preclude defendants from introducing evidence concerning damages, affirmative defenses, or material allegations. On January 15, 1999, after defendants had failed to respond within the thirty-day limit, plaintiffs moved for partial summary judgment. This court[1] granted plaintiff's motion January 30, 1999.

On June 15, 1999, plaintiff filed a motion for partial summary judgment on its claims for patent infringement, trademark infringement and unfair competition, and violation of California's Business and Professions Code § 17200. Following a hearing, the court granted the motion August 3, 1999, finding that defendants had forfeited the opportunity to contest proper ownership of the patent through their failure to timely file an opposition brief to plaintiff's first motion for partial summary judgment and their failure to timely respond to plaintiff's request for admissions, and further finding that defendants' sale of goods with plaintiff's "Avid" trademark violated federal and state trademark laws.

On October 15, 1999, plaintiff filed the instant motion seeking damages and injunctive relief. Avid seeks damages in the amount of $1,603,350 ($534,450 trebled), attorney fees, costs, prejudgment interest, and a conversion of the earlier preliminary injunction to a permanent injunction. Defendants respond that they owe, at most, $1875 in damages. They contend that enhancement of damages, attorney fees, and further injunctive relief are not warranted on the record before the court.

---

[1]The case was transferred to this Court on December 18, 1998.

2

## II

## Factual Background

The following facts are undisputed unless otherwise indicated.

Avid sells radio frequency identification (RFID) products. These products allow users to track the movements of animals who have had a transponder implanted; the transponder communicates with a Reader, which the user operates to determine the animal's location. End-users typically include animal control facilities, veterinarians, government agencies, and ranchers.

Avid, Inc. was granted patent No. 318,658 (the "'658 patent") for its identity tag reader design on July 30, 1991. See Compl. Exh. 1. Avid, Inc. assigned its interest in the '658 patent to Avid Identification Systems, Inc. on May 21, 1998.

The trademark "Avid" was assigned by the USPTO to American Veterinary Identification Devices, Inc. on May 2, 1989. Compl. Exh. 4. American Veterinary Identification Devices assigned the mark to Avid Marketing, Inc. on August 15, 1994. Thompson Dec. (7/12/99) Exh. 3-4. Avid Marketing, Inc. then changed its name to Avid Identification Systems, Inc. on May 21, 1997. See id. Exh. 5. The "Avid" mark was registered with the California Secretary of State for state trademark protection on September 15, 1988 on behalf of Hannis L. Stoddard III, Avid's president. Stoddard assigned rights to the state mark to Avid Identification Systems, Inc. on May 20, 1998. See Harris Decl. Exh. 4.

Semiconductor Venture International ("SVI"), a company based in Thailand, initially assembled Avid's Readers. Assembly involved embedding circuitry in a plastic housing that embodied the design of the '658 patent and was marked with plaintiff's patent and trademark notices. SVI would receive roughly 50% of the Reader parts on consignment from Avid, supply the other necessary parts and the labor to assemble the Readers, and sell the resulting Readers to Avid

3

for $34 each.[2] See Thompson Dec. (10/15/99) Exh. 9 (Roskam Dec.) ¶¶ 3-4. Final assembly, testing, inspection, and labeling of the Readers took place in Avid's California facilities. Pl.'s Facts ¶¶ 7-8.

Defendant Hull worked as Avid's Chief Operating Officer and Vice President of International Sales. Upset with the way Stoddard managed Avid, Hull left on October 29, 1997 to found his own business, defendant Global. As part of this business, he purchased RFID Readers from SVI that SVI had assembled for Avid. Thompson Dec. (6/15/99) Exh. F, ¶ 8. The total number of Readers Hull obtained from SVI is disputed. Hull claimed he purchased 569 Readers through this channel. See Hull Dec. ¶ 5.[3] Avid, alternatively, contends that 1018 of the Readers SVI was to assemble for it are not accounted for, and the Court should assume that Hull purchased all of them.[4]

What Hull did with these Readers is unclear; plaintiff contends that he sold them to a domestic Avid customer, while defendants counter that "Global offered to sell RFID units to buyers outside the United States. What the buyers did with

---

[2] Under their agreement, SVI would provide 200 Readers per month over twelve months to Avid, receiving a total of $81,600. See Thompson Dec. (10/15/99) Exh. 9 (Roskam Dec.), ¶3.

[3] Hull's admission that he purchased 569 Readers is qualified by his assertion that he did not take possession of them. See Hull Dec. ¶¶ 5, 9. He provides no support from SVI or elsewhere for this assertion, and claims to be unable to provide documentary evidence of actual sales of the Readers because such documentation was stolen. "[I]f actual damages cannot be ascertained with precision because the evidence available from the infringer is inadequate, damages may be estimated on the best available evidence, taking cognizance of the reason for the inadequacy of proof and resolving doubt against the infringer." Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 1572 (Fed. Cir. 1996).

[4] Defendants cite Peter Roskam's declaration for the 1018 figure. The declaration reads, in part, "As of September 9, 1996, SVI had shipped 1380 of the original 2400 new units, had 302 in inventory, and parts for 473 more. SVI needed components from AVID to build the last 243 new units." Roskam Dec. ¶ 9. Apparently, defendants have summed up 302 + 473 + 243 to arrive at 1018, though they have provided no indication that SVI received the additional parts from Avid to build the remaining 243 units, or that these figures were still accurate in November 1997, when SVI sold its inventory to Hull. See id. ¶ 11.

4

them was outside Global's control." Defs.' Resp. to P's Statement of Uncontroverted Facts, No. 13. Global does not dispute selling Readers to Biomark, Inc., a company located in Idaho. Pl.'s Facts ¶ 14; Defs.' Response to Pl.'s Facts, ¶ 14 (denying the misrepresentation of the products but not the sale itself). Plaintiffs also allege that defendants sold RFID Readers to Microchip Identification Systems, Inc. ("Microchip"), a Louisiana company. Microchip then resold them to Konnex International Limited ("Konnex"), which is located in Hong Kong. Troesch Decl., ¶ 25 & Exh. 5. Defendants dispute these allegations, see Defs.' Response to Pl.'s Facts, ¶¶ 15-16, but do not propose any contrary explanation for the evidence linking Global with Microchip and Konnex.[5]

## III

### Legal Analysis

*A. Damages Award*

Plaintiff contends that it is the only supplier of Readers capable of reading its encrypted tags.[6] See P's Reply at 4; Stoddard Dec. ¶ 4. Defendants have not refuted this assertion.

Where, as here, a patent owner claims that the quantity of its lost sales equals the sales of its infringer, courts apply the four-part test enunciated in Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156 (6th Cir. 1978); see also Water Techs. Corp. v. Calco, Ltd., 850 F.2d 660, 671-72 (Fed. Cir. 1988) (noting that the Federal Circuit has adopted the Panduit test). Under

---

[5] Indeed, defendants admit to selling Avid Readers to Konnex. See Opp. to P's Mot. for Partial SJ at 13 ("In the Konnex paperwork the products are identified as 'Global ID Standard Readers'. The products themselves are not counterfeit, but Avid Product that Avid had manufactured and assembled, then refused to take possession of or pay the manufacturer for.").

[6] Avid has provided a limited license to a competitor, Destron, to make readers capable of reading the Avid tags. However, the license only permits Destron to provide these readers to approved animal shelters. See P's Reply at 4; Stoddard Dec. ¶ 4.

5

Panduit, a patent owner seeking damages must prove "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." Panduit, 575 F.2d at 1156.

As plaintiff notes, defendants dispute only the second and fourth factors. Defendants argue that competitors Destron and Trovan manufacture acceptable substitutes for the Avid Standard Reader, but provide no evidence to refute the assertions in the Stoddard Declaration.

The only remaining disputed Panduit factor is the amount of lost profits. Plaintiff sets the number of disputed units at 1018, based on the number of units SVI had not delivered to it as of September of 1996. See Mot. for Damages at 5-6. According to defendants, Hull purchased 569 Readers from SVI in November 1997. See Hull Dec. ¶ 5. In light of the speculative nature of plaintiff's proffered alternative, the Court accepts the 569 figure and calculates damages accordingly.

The parties also dispute the average price per unit. Plaintiff argues that the unit price averaged $600, but varied by customer, with some paying as much as $950. See Stoddard Dec. ¶ 9; Thompson Supp. Dec. Exhs. 14-17. Elsewhere, plaintiff quoted the price as $550. See Thompson Dec. (10/15/99) Exh. 6 (Troesch Dec.) ¶ 18 (noting that Hull sold Readers to Biomark for $200 per unit, "which is about $350 less than AVID's price for the Standard Reader."). Defendants counter that this price is artificially inflated, and should more accurately be set at $200 per unit. See Opp. at 5. In support of this estimate, defendants point to an accounting document covering May 1994 through May 1995 listing the average unit price for a Standard Reader as $195.40. See Tabone Dec. Exh. C at C-2. They also note that $200 per unit was the price Hull charged to Biomark. See Opp. at 5. Plaintiff responds that the $195.40 average included

the Readers Avid donated to animal shelters,[7] and consequently does not provide an accurate figure for the average price of units sold to paying customers. See Reply at 4; Thompson Dec. (10/15/99) Exh. 6 (Troesch Dec.) ¶ 5.

The price defendants charged for the infringing Readers is irrelevant to the damages calculation. Presumably defendant's price was below Avid's; otherwise, customers would have had no incentive to buy from Global, rather than Avid. Plaintiff provides no evidence of how it arrived at the $600/unit figure, though average price data undoubtedly exists. Given this absence of accessible data, the Court finds plaintiff's earlier price estimate more credible. Thus, it calculates damages using a per unit price of $550.

Plaintiff contends that its average cost per unit is $75. See Stoddard Dec. ¶ 9. Defendant has not refuted this figure with more than a general assertion that it does not take into account certain expenses associated with final sale of the product. See Opp. at 7 ("[The $75 figure] does not take into account overhead, sales expenses, commissions, shipping, insurance, or any . . . other charges that must be paid before an enterprises [sic] makes a profit."). Barring any evidence to the contrary, the Court accepts the $75/unit cost figure proposed by plaintiff.

With these variables in place, plaintiff's damages for defendants' infringement of its patent rights equal (569) (550-75) = $270,275.00.

The same damages calculation applies to defendants' violation of plaintiff's trademark. See 15 U.S.C. § 1117(a); Intel Corp. v. Terabyte Int'l, Inc., 6 F.3d 614, 620 (9th Cir. 1993). Plaintiff has said that it will accept the same damages figure for defendants' infringement of its patent and its trademark rights. See Mot. for Damages at 11. The $270,275.00 figure accordingly represents the damages due under both the applicable patent and trademark statutes. Moreover, plaintiff

---

[7] By donating readers to animal shelters, Avid hoped to create a market for its transponders. See Thompson Dec. (10/15/99) Exh. 6 (Troesch Dec.) ¶ 5.

has agreed to reduce the damage award proportionately for each infringing Reader defendants return to Avid. See Mot. for Damages at 9.[8] The damages award shall accordingly be reduced on a pro rata basis, based on the number of Readers Hull (or SVI) returns to Avid.[9] Avid shall inform the Court within thirty days of this Order of the number of Readers, if any, that have been returned to it.

### B. Enhancement

Plaintiff requests that the Court treble the damage award, pursuant to the statutory enhancement limit contained in 35 U.S.C. § 284 (patent violation)[10] and 15 U.S.C. 1117(b) (trademark violation).[11] Section 284 does not specify the conditions under which courts may provide for an enhancement of damages. However, courts interpreting the statute have found that enhancement "must be premised on willful infringement or bad faith." Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 1574 (Fed. Cir. 1996) (quoting Yarway Corp. v. Eur-Control USA, Inc., 775 F.2d 268, 277 (Fed. Cir. 1985)).

Plaintiff argues that defendants' conduct in this case was egregious enough to warrant trebling of damages. It notes that Hull, as a former employee of Avid

---

[8] Plaintiff agrees in its brief "to accept a reduction in damages in the amount of $525 for each infringing Reader which Defendants deliver to Avid." Mot. for Damages at 9. Presumably, this assertion is premised on a damage award based on a $525/unit figure. Given the Court's determination to set the per unit profit at $475, it will not hold Avid to the $525 figure.

[9] In other words, the damages amount shall be reduced by $950 (the $475/unit profit figure doubled) per Reader returned. If, as Hull asserts, he does not have physical possession of the Readers he purchased from SVI but allegedly did not sell, he will be able to reduce his damage award by directing SVI to return his Readers to Avid.

[10] "[T]he court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284.

[11] "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C. § 1117(a). In case of counterfeiting, the court is required to treble the damages, "unless the court finds extenuating circumstances." Id. § 1117(b).

8

and co-inventor of the '658 patent, clearly knew of the existence of both the patent and trademark he infringed, and that his infringement was therefore willful. Defendants respond that Hull's belief in the legality of his actions was reasonable, in that he questioned the validity of Avid's ownership of the '658 patent, he thought the transaction with SVI was legitimate, he was selling real (as opposed to counterfeit) Avid goods, and he did not use the Avid name when selling to customers.

This dispute differs substantially from a traditional counterfeiting case. Hull may have felt morally entitled to a share of the profits from the Readers, given his participation in Avid's development and the negative terms upon which his relationship with Avid terminated. Nevertheless, he must have known his actions were not wholly aboveboard. Avid had given SVI parts for Reader assembly on consignment, and expected to purchase the finished Readers for $34 per unit, a figure that undoubtedly factored in the cost of the parts it provided. Even if Hull believed that Avid was treating him, SVI, and its customers poorly, he must have known that this fact did not entitle him to purchase the finished Readers — produced in part with materials developed and provided by Avid — and resell them at a profit. Indignation does not justify violation of the intellectual property laws.

Given the circumstances of the case, the Court finds that doubling is a proper enhancement. Accordingly, plaintiff is awarded $540,550.00 in damages.

*C. Attorney Fees*

Citing the applicable patent and trademark statutes, plaintiff also requests attorney fees.[12] The criteria for determining whether to award attorney fees overlaps with the enhancement criteria, but differs slightly. See Sensonics, 81

---

[12]"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285 (patent); 15 U.S.C. § 1117(a) (trademark).

9

F.3d at 1574. Under patent law, factors creating the exceptional situation in which attorney fees are deserved include bad faith, willfulness, "[l]itigation misconduct[,] and unprofessional behavior." Id. In the trademark law context, courts have found that "a trademark case is exceptional for purposes of an award of attorneys' fees when the infringement is malicious, fraudulent, deliberate or willful." Intel, 6 F.3d at 621 (quoting Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1409 (9th Cir. 1993)); see also Rolex Watch, U.S.A., Inc. v. Michel Co., 179 F.3d 704, 711 (9th Cir. 1999). The award "may be limited by equitable considerations." Rolex, 179 F.3d at 711; Intel, 6 F.3d at 620; Lindy Pen Co., 982 F.2d at 1409.

The conduct of defendants and their counsel appears more misguided or incompetent than malicious or fraudulent. Though Hull has not recognized any wrongdoing on his part, he has admitted to having purchased 569 units from SVI. While Hull could have been more candid about the status of the Readers not sold to Biomark and Konnex, Avid has not proven that he engaged in any deliberate deception. Indeed, this litigation has been marked more by defendants' apathy than by their active dishonesty or malice. Avid's understandable frustration in dealing with an unrepentant infringer and an unresponsive adversary is, perhaps regrettably, not exceptional in today's world of commercial litigation. Because defendants' actions do not qualify as "exceptional" within the meaning of the relevant statutes, the Court denies plaintiff's motion for attorney fees.

### D. Injunction

Plaintiff requests that the Court use its authority under 35 U.S.C. § 283 to convert Judge Lew's July 22, 1998 preliminary injunction into a permanent injunction.[13] The injunction enjoins defendants "from making, using, offering to

---

[13]"The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent,

10

sell, selling, or importing into the United States" products embodying the '658 patent; infringing the patent or the trademark "Avid"; misappropriating Avid's trade secrets; contacting Avid's customers in connection with RFID products; and misrepresenting the origin of the Readers they sell. See Thompson Dec. (10/15/99) Exh. 1. Defendants counter that any permanent injunction should be more narrowly drawn to protect only sales within the United States, and only Avid's design patent and trademark rights.

Courts usually grant injunctive relief once they find that a defendant has infringed on a plaintiff's intellectual property. See W.L. Gore & Assocs., Inc. v. Garlock, Inc., 842 F.2d 1275, 1281 (Fed. Cir. 1988). To deny a request for permanent injunction, courts require sufficient reason; temporary cessation of infringement usually does not qualify as such a reason, "unless the evidence is very persuasive that further infringement will not take place." Id. at 1281-82.

There is no such persuasive evidence in this case. Indeed, just the opposite is true: defendants have not accounted for most of the Readers they purchased from SVI. To prevent future infringement, the Court hereby converts the preliminary injunction of July 22, 1998 into a permanent injunction, with the following modification: the injunction does not prevent SVI from returning any undelivered Readers to Avid. Readers so returned shall be factored into the damages calculation in the manner described above.

### E. Costs and Prejudgment Interest

Finally, plaintiff requests costs and prejudgment interest.[14] The prevailing plaintiff is entitled to costs under the patent and trademark laws. See 35 U.S.C.

---

on such terms as the court deems reasonable." 35 U.S.C. § 283.

[14]Plaintiff also asks the Court to declare a constructive trust over Hull's shares of Avid's non-publicly traded stock to ensure partial satisfaction of any judgment against him. See Compl. ¶ 15. Because the Court has no way of accurately valuing the stock, it declines to impose such a trust.

11

§ 284 (patent); 15 U.S.C. § 1117(a) (trademark). Defendants do not contest plaintiff's request. Therefore, defendants are ordered to pay the costs for this action. Avid shall submit a Bill of Cost to the Clerk's Office within fifteen days of the entry of this judgment.

A prevailing patent owner is ordinarily entitled to prejudgment interest. See 35 U.S.C. § 284; General Motors Corp. v. Devex Corp., 461 U.S. 648, 655 (1983). Defendant does not contest the propriety of such an award. Accordingly, plaintiff shall provide the Court with an estimate of prejudgment interest, calculated pursuant to 28 U.S.C. § 1961(a), in the same report detailing the number of units returned to Avid. Upon determination of the final amount of damages and interest due, the Court will issue a final judgment.

## IV
## Conclusion

For the foregoing reasons, defendants are ordered to pay plaintiff $540,550.00 in damages, costs in an amount to be determined, and prejudgment interest. The preliminary injunction is converted into a permanent injunction, though modified to allow SVI to return any Readers it may have to Avid.

IT IS SO ORDERED.

DATED: 2/16/00

Nora M. Manella
United States District Judge